UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID MYTYCH,<br><br>       Plaintiff,<br><br>    v.<br><br>NATIONAL PARK SERVICE, et al.,<br><br>      Defendants. | Civil Action No. 25-4291 (TNM) |

**DEFENDANTS' OPPOSITION
<u>TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

Table of Contents ................................................................................................................... i

Table of Authorities .............................................................................................................. ii

Introduction ........................................................................................................................... 1

Background ............................................................................................................................. 2

    I.      Statutory and Regulatory Framework ................................................................. 2

    II.     Factual Background ............................................................................................. 3

    III.    Procedural Background ........................................................................................ 7

Legal Standards ..................................................................................................................... 8

Argument ............................................................................................................................. 10

    I.      Plaintiff is Unlikely to Succeed on the Merits. ............................................... 10

    II.     Plaintiff Has Failed to Establish Irreparable Harm. ........................................ 22

    III.    The Balance of Equities Favors Defendant, and the Public Interest Does Not Support the Injunction. .......................................................................................... 25

    IV.    Any Preliminary Injunction Should Be Stayed. .............................................. 27

    V.     The Court Should Order that Plaintiffs Post a Bond as a Condition of Preliminary Relief. .................................................................................................................... 27

Conclusion ........................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.N.S.W.E.R. Coal. v. Basham*,
    845 F.3d 1199 (D.C. Cir. 2017) ................................................................... 17, 18

*A.N.S.W.E.R. Coal. v. Jewell*,
    153 F. Supp. 3d 395 (D.D.C. 2016) ...................................................... 14, 17, 25

*Am. Airways Charters, Inc. v. Regan*,
    746 F.2d 865 (D.C. Cir. 1984) ............................................................................ 11

*Am. Meat Inst. v. Dep't of Agric.*,
    968 F. Supp. 2d 38 (D.D.C. 2013) ..................................................................... 24

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006) ........................................................................................... 10

*Ass'n v. Reno*,
    199 F.3d 1352 (D.C. Cir. 2000) ......................................................................... 11

*Aviles-Wynkoop v. Neal*,
    978 F. Supp. 2d 15 (D.D.C. 2013) ..................................................................... 23

*Baker DC v. Nat'l Lab. Rels. Bd.*,
    102 F. Supp. 3d 194 (D.D.C. 2015) ................................................................... 24

*Barry v. United Food & Com. Workers*,
    755 F. Supp. 3d 34 (D.D.C. 2024) ..................................................................... 10

*Benisek v. Lamone*,
    585 U.S. 155 (2018) ........................................................................................... 10

*Bronner v. Duggan*,
    364 F. Supp. 3d 9 (D.D.C. 2019) ....................................................................... 11

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ....................................................................... 8, 22

*Cheeks v. Fort Myer Constr. Co.*,
    722 F. Supp. 2d 93 (D.D.C. 2010) ........................................................ 11, 12, 13

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ........................................................................................... 13

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) ................................................................ 10

*Clark v. Community for Creative Non-Violence*,
  468 U.S. 288 (1984) .................................................................... 16, 26

*Clevinger v. Advoc. Holdings, Inc.*,
  134 F.4th 1230 (D.C. Cir. 2025) .......................................................... 22

*Cornish v. Dudas*,
  540 F. Supp. 2d 61 (D.D.C. 2008) ........................................................ 23

*Cross v. EEOC*,
  Civ. A. No. 25-3702 (TNM), 2025 WL 3280764 (D.D.C. Nov. 25, 2025) ............................ 10

*Damus v. Nielsen*,
  Civ. A. No. 18-0578 (JEB), 2018 WL 3232515 (D.D.C. July 2, 2018) ........................... 9

*Davis v. Pension Ben. Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ........................................................... 9

*Dorfmann v. Boozer*,
  414 F.2d 1168 (D.C. Cir. 1969) ........................................................... 8

*Farris v. Rice*,
  453 F. Supp. 2d 76 (D.D.C. 2006) ......................................................... 9

*Franklin v. Vilsack*,
  Civ. A. No. 12-2027 (RJL), 2012 WL 6625757 (D.D.C. Dec. 18, 2012) ......................... 12

*Hanson v. Dist. of Columbia*,
  120 F.4th 223 (D.C. Cir. 2024) .......................................................... 24

*Harpole Architects, P.C. v. Barlow*,
  668 F. Supp. 2d 68 (D.D.C. 2009) ........................................................ 12

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
  452 U.S. 640 (1981) ............................................................ 16, 17, 24, 26

*Henke v. Dep't of the Interior*,
  842 F. Supp. 2d 54 (D.D.C. 2012) ........................................................ 23

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
  505 U.S. 672 (1991) ..................................................................... 14

*Kim v. FINRA*,
    698 F. Supp. 3d 147 (D.D.C. 2023) ...................................................................................... 25

*Kleppe v. New Mexico*,
    426 U.S. 529 (1976) ...................................................................................................................... 14

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .......................................................................................................... 9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .............................................................................................................. 10, 11

*Mashack v. Jewell*,
    149 F. Supp. 3d 11 (D.D.C. 2016) ........................................................................................ 19, 20

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ........................................................................................................................ 8

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................................................. 9, 25

*Pantoja v. Martinez*,
    No. 21-7118, 2022 WL 893017 (D.C. Cir. 2022) .......................................................................... 9

*Powers v. Ohio*,
    499 U.S. 400 (1991) ...................................................................................................................... 11

*Reedom v. Sec'y of Agric.*,
    Civ. A. No. 12-1927 (JDB), 2012 WL 6085390 (D.D.C. Nov. 29, 2012) .................................. 12

*S. Airways Express, LLC v. United States Dep't of Transp.*,
    159 F.4th 50 (D.C. Cir. 2025) ...................................................................................................... 19

*Santos v. Collins*,
    Civ. A. No. 24-1759 (JDB), 2025 WL 1823471 (D.D.C. Feb. 26, 2025) .................................. 22

*Schindler Elevator Corp. v. Wash. Metro Area Transit Auth.*,
    514 F. Supp. 3d 197 (D.D.C. 2020) ............................................................................................ 10

*Scottsdale Capital Advisors Corp. v. Fin. Indus. Regul. Auth. Inc.*,
    678 F. Supp. 3d 88 (D.D.C. 2023) .............................................................................................. 10

*Searcy v. Houston Lighting & Power Co.*,
    907 F.2d 562 (5th Cir. 1990) .................................................................................................. 12, 13

*Seven Cnty. Infrastructure Coal. v. Eagle County,*
    605 U.S. 168 (2025) ................................................................................ 19

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) .................................................................................. 9

*Thomas v. Chicago Park District,*
    534 U.S. 316 (2002) .......................................................................... 14, 15

*U.S. Conf. of Cath. Bishops v. Dep't of State,*
    770 F. Supp. 3d 155 (D.D.C. 2025) ....................................................... 10

*United States Ass'n of Reptile Keepers, Inc. v. Zinke,*
    852 F.3d 1131 (D.C. Cir. 2017) ............................................................... 9

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ................................................................................ 16

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................................................ 11

*Wemhoff v. Bush,*
    167 F. Supp. 2d 32 (D.D.C. 2001) ......................................................... 14

*White House Vigil for ERA Comm. v. Clark,*
    746 F.2d 1518 (D.C. Cir. 1984) ....................................................... 16, 26

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................... 8, 9

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ............................................................... 23

**Statutes**

5 U.S.C. § 706 ................................................................................................ 19, 22

42 U.S.C. § 1981 ................................................................................................... 12

54 U.S.C. § 100101 ........................................................................................... 2, 26

54 U.S.C. § 100102 ......................................................................................... 15, 17

**Rules**

Fed. R. Civ. P. 65(c) .............................................................................................. 27

**Regulations**

36 C.F.R. § 1.5(a)...............................................................................................................15, 17

36 C.F.R. § 7.96.....................................................................................................passim

36 C.F.R. §§ 1.5....................................................................................................................7

Defendants, Frank Lands, in his official capacity as Deputy Director of Operations for the National Park Service, Jennifer Nersesian, in her official capacity as Regional Director at the National Park Service, Kevin Griess, in his official capacity as Superintendent of the National Mall and Memorial Parks, Chad Tinney, in his official capacity as Deputy Superintendent of the National Mall and Memorial Parks, and the National Park Service (collectively, "NPS") submit this opposition to *pro se* Plaintiff David Mytych's Motion for Preliminary Injunction ("PI Mot.," ECF No. 2).

## INTRODUCTION

Plaintiff asks this Court to issue the extraordinary remedy of a preliminary injunction to cancel a temporary, construction-related closure for repairs and renovations at Columbus Plaza so that Plaintiff's group can demonstrate there. He claims that the closure is unlawful under the First Amendment and Administrative Procedure Act. But the National Park Service ("NPS") followed its regulations to the letter. Because the construction involves major renovations and maintenance to Columbus Plaza, NPS closed the area to protect public safety and park resources in line with its regulations. NPS went above and beyond the procedures prescribed under its regulations; it notified the public of the closure, publicized in detail the closure's purpose, duration, and precise geographic scope, explained why alternative measures were not employed, gave Plaintiff's group advance notice of the closure before issuing the public notice, and offered Plaintiff's group an alternate site. The temporary closure is a classic, content-neutral time, place, and manner limitation in a traditional public forum; it is narrowly tailored to NPS's (and the public's) interests in public health and safety and protecting scenic values and cultural resources and leaves open ample alternative channels of communication.

Plaintiff's motion for a preliminary injunction should be denied. First, Plaintiff does not have standing to bring this action in the first place, because his supposed injuries derive entirely

from a legal entitlement (the demonstration permit) that does not belong to him, but rather to a non-party organization.  Second, Plaintiff cannot show a likelihood of success on the merits, irreparable harm, or that the balance of equities favors a preliminary injunction.  His First Amendment allegations are bare and unsupported, and his APA claim fails because he has not alleged a substantive or procedural violation by NPS.  His supposed harms boil down to the organization's inability to demonstrate at the exact location of construction during the temporary closure and the alleged inconveniences of having to relocate.  His interests are substantially outweighed by the NPS's – and the public's – interests in rehabilitating Columbus Plaza and ensuring public health and safety during the construction.  His motion should therefore be denied.

**BACKGROUND**

I.    <u>**Statutory and Regulatory Framework**</u>

The NPS, a federal agency within the United States Department of the Interior, is charged with "conserv[ing]" and "providing for the enjoyment of the scenery, natural and historic objects, and wild life" on NPS land such that it is left "unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).  In addition, Executive Order 14252 charges the Secretary of the Interior with developing and implementing "a program to beautify and make safe and prosperous the District of Columbia."  Declaration of Jennifer T. Nersesian ("Nersesian Decl.," Ex. A) ¶ 5, Ex. 1. Accordingly, the Secretary of the Interior issued Secretarial Order 3428 to implement a "coordinated beautification plan for Federal and local facilities, monuments, lands, parks, and roadways in and around the District of Columbia."  *Id.* ¶ 5, Ex. 2.

NPS may close all or a portion of a park area or impose use limits where "necessary for the maintenance of public health and safety, protection of environmental or scenic values, protection of natural or cultural resources, [or] implementation of management responsibilities."  36 C.F.R.

§ 1.5(a).  In the event of a closure, NPS must notify the public with signs, maps, publication, or other appropriate methods.  *Id.* § 1.7.

As a general rule, special events and demonstrations in the National Capital Region (including Columbus Plaza) may be held only pursuant to a permit, which is subject to certain restrictions provided in the regulations.  *Id.* § 7.96(g).  Temporary structures may be erected only for "the purpose of symbolizing a message or meeting logistical needs," and may be subject to additional, reasonable restrictions imposed by the Regional Director "in the interest of protecting the park areas involved, traffic and public safety considerations, and other legitimate park value concerns."  *Id.* § 7.96(g)(5)(vi).  The structures must be removed "as soon as practicable" after the conclusion of the permitted demonstration.  *Id.* § 7.96(g)(5)(vi)(B).  Demonstration permits may be revoked where, among other grounds, it "cannot reasonably be accommodated in the particular area" or "continuation of the event presents a clear and present danger to the public safety, good order or health."  *Id.* §§ 7.96(g)(6), 7.96(g)(4)(vii).  In the former case, the Regional Director must propose an alternative site to the applicant.  *Id.* § 7.96(g)(4)(vii)(C).  Plaintiff has not challenged these regulations.  *See generally* Compl. (ECF No. 1).

## II.    Factual Background

### A.    Columbus Plaza Rehabilitation Project History

The need for repairs and renovations at Columbus Plaza is longstanding and well-documented.  In 2010, the NPS commissioned an Investigative Condition Assessment and Report, which found that the Columbus Memorial and Fountain were in poor condition, and that the fountain had not been in operation since 2005.  Nersesian Decl. ¶ 10.  It also found that the granite steps, mechanical vault, and stone balustrades at the Plaza were in fair or poor condition.  *Id.*  In December 2025, at the NPS's request, the Trust for the National Mall issued an updated report documenting the current and deteriorating condition of Columbus Plaza and the need for

rehabilitation.  *Id.* ¶ 11.  On October 17, 2025, the NPS began the contracting process for repair work at Columbus Plaza and other locations in the District, and in early November it held pre-proposal site visits.  *Id.* ¶¶ 12-13.  The request for proposal for Columbus Plaza identified extensive repairs and upgrades, including work on the fountain and water features, mechanical vault system, storm drains, underground piping, turf, lighting fixtures, stone balustrades, and other features of the Plaza.  *Id.* ¶ 14.  On December 8, 2025, NPS completed an assessment of Columbus Plaza under Section 106 of the National Historic Preservation Act, describing the project as "a full rehabilitation of both the fountain system and the surrounding landscape and hardscape." *Id.* ¶ 16. Also on December 8, 2025, NPS completed a Categorical Exclusion Documentation Form for the Columbus Square rehabilitation project to document compliance with the National Environmental Policy Act.  The application of a categorical exclusion for the project was justified, in part, because "[t]he project responds to deterioration documented in NPS planning record – such as long-term fountain shutdown due to failed piping and a broken water main, worn pavement, and drainage problems – by repairing and upgrading existing systems within the established footprint rather than altering the historic plan."  *Id.* ¶ 17.

B. **Beginning of Project**

On December 5 and 9, 2025, respectively, NPS selected and formally awarded a contract and issued a notice to proceed.  *Id.* ¶ 15.  On the same day, NPS published a public notice of closure of Columbus Plaza on its website, indicating that the construction area would close at 4:00 pm, December 10, 2025, and reopen at 12:00 pm, June 1, 2026.  Record of Determination for a Partial and Temporary Closure of a Portion of the National Mall and Memorial Park for Renovations ("Public Notice of Closure") (Dec. 9, 2025), available at https://www.nps.gov/nama/learn/management/columbusrod25.htm (last visited Dec. 15, 2025); *id.* ¶ 21.  This timeline ensures that rehabilitation of the plaza, along with other renovations planned

in the D.C. area, is completed in time for the Semiquincentennial anniversary of the Declaration of Independence, July 4, 2026.  Nersesian Decl. ¶¶ 19, 22-24.  Also on December 9, 2025, the Superintendent of the National Mall and Memorial Parks signed a Record of Determination for a partial and temporary closure of Columbus Plaza, which found that the temporary closure was necessary to "provide for public health and safety, protect scenic values and cultural resources, implement management responsibilities, and avoid conflict among visitor use activities during the renovation of the park."  *Id.* ¶ 20.

On December 11, 2025, on-side operations began, starting with construction of a perimeter fence for public safety.  *Id.* ¶ 18.  As of filing this opposition, the contractor has been mobilized, and a site survey is underway.  *Id.* ¶ 23.  The contractor is preparing submittals and shop drawings for the stone steps/monument for NPS.  *Id.*  At the site, the contractor has broken ground and begun removing pavers and granite pieces at the site, as evidenced in photos shown in the attached declaration.  *Id.*  They were taken at Columbus Plaza at approximately 4:27 PM on December 16, 2025.  *Id.*

### C.    **FLARE's demonstration**

Plaintiff claims that he is "a lead organizer" of a non-profit corporation known as "FLARE USA" ("FLARE").  *See* Declaration of David Mytych ("Mytych Decl.," ECF No. 2-1) ¶¶ 1-2; Compl. (ECF No. 1) ¶ 11-12.  According to Plaintiff, on May 11, 2025, NPS issued a demonstration permit to FLARE for Columbus Plaza.  Mytych Decl. (ECF No. 2-1) ¶ 6.  As the initial permit neared expiration, FLARE received a reissued permit around August 26, 2025.  *Id.* ¶ 6.  FLARE's demonstration has included signs, banners, information handouts, tents, and tables.  *Id.* ¶ 4.  Plaintiff alleges that on October 3, 2025, NPS, U.S. Park Police, and U.S. Marshals ordered FLARE demonstrators to remove the structures and loaded equipment and personal property into trucks.  *Id.* ¶¶ 7-8.

On November 7, 2025, at 3:48 PM, NPS's Division of Permits Management for National Mall and Memorial Parks ("DPM") received an application from FLARE to demonstrate at Columbus Plaza.  Declaration of Deborah Deas ("Deas Decl.," Ex. B) ¶ 5; Mytych Decl. (ECF No. 2-1) ¶¶ 10-11.  The application listed FLARE USA as the permittee, and "Jacob" as the "Person in Charge of the Event."  Deas Decl. ¶ 6, Attach. 1.  Plaintiff provided his personal information only as the "person completing application" in Section 6 of the application.  *Id.*, Attach. 1.  DPM generally does not issue permits to anyone other than the "Individual/Organization" and "Person in Charge of the Event" in Section 1 of applications the permittee specifically requests it.  *Id.*  ¶ 7.

Less than 24 hours after receipt of FLARE's application, on November 8, 2025, at 1:45 PM, DPM issued Permit 25-1819 to the emails provided for FLARE and Jacob on the application. *Id.* ¶ 8, Attach. 2.  A courtesy copy was emailed to Plaintiff later that day.  *Id.*  The permit prohibits the use of temporary structures, among other limitations and conditions.  *Id.*, Attach. 2.

On November 9, 2025, FLARE resumed its demonstration at Columbus Plaza.  Mytych Decl. (ECF No. 2-1) ¶ 11.

On November 10, 2025, Plaintiff emailed DPM, contending that the permit was invalid due to an error in permit number contained in the header, and asserting that his application was therefore "deemed granted" under 36 C.F.R. § 7.96(g)(3).  Deas Decl. ¶ 11.  About an hour and a half later, DPM emailed Plaintiff, FLARE, and Jacob a copy of the permit with corrected header information and noted that the error had not invalidated the permit.  *Id.* ¶ 12, Attach. 3.  Later that day, DPM added the emergency dispatch telephone number for the United States Park Police to the permit and sent an updated version.  *Id.* ¶ 13, Attach. 3, 4.  This final version (the "FLARE Permit") was the operative version of the permit until it was amended on December 9, 2025, with a proposed alternate demonstration site.  *Id.* ¶ 14.

On the evening of December 8, 2025, DPM Chief Marisa Richardson notified FLARE verbally that FLARE needed to remove its structures and vacate Columbus Plaza by 12:00 PM on December 10, 2025, due to planned construction.  Mytych Decl. (ECF No. 2-1) ¶ 13.

On December 9, 2025, at 6:13 PM, DPM emailed an amended version of the FLARE Permit to Jacob and Plaintiff and stated that "Columbus Plaza is being closed to provide for public safety during a construction project set to begin this week" and that public notice of the closure would be posted to the park website and in Columbus Plaza in short order.  *Id.* ¶ 14; Deas Decl. ¶ 15, Attach. 5.  Attached to the email were a draft permit updating the location of FLARE's permitted activity, a signed closure notice and Record of Determination ("ROD") closing Columbus Plaza for construction-related activity, and a signed draft amended permit relocating FLARE's demonstration to Stanton Park.  Mytych Decl. (ECF No. 2-1) ¶¶ 14-15; *see* Deas Decl. ¶ 16, Attach. 6.  The closure notice and ROD stated that the construction was for "renovation of the fountain, cleaning of the statues, plaza and turf renovations," including "construction staging" associated with work on the Columbus Fountain.  Notice and ROD (ECF No. 2-4 at 16-19).  Plaintiff declined the alternative proposal, considering the location less desirable.  Mytych Decl. (ECF No. 2-1) ¶¶ 17-19.

### III.    **Procedural Background**

On December 10, 2025, Plaintiff filed the Complaint.  *See generally* Compl. (ECF No. 1). Plaintiff alleges violations of the First Amendment, the Administrative Procedure Act ("APA"), and NPS regulations under Title 36 of the Code of Federal Regulations.  *Id.* ¶¶ 65-82.  Plaintiff requests declarations that FLARE's demonstration permit is unrevoked and that the eviction order, closure determination, and relocation amendment are unlawful, a temporary restraining order and preliminary injunction "prohibiting Defendants . . . from evicting Plaintiff from Columbus Plaza or otherwise interfering with Plaintiff's ongoing demonstration absent full compliance with 36

C.F.R. §§ 1.5, 1.7, and 7.96(g) and the Constitution," and an injunction to enjoin Defendants from seizing or destroying Plaintiff's structures, equipment, or expressive materials associated with FLARE's demonstration. *Id.*, Prayer for Relief.

Contemporaneously with filing his Compliant, Plaintiff also moved for a temporary restraining order and a preliminary injunction. *See generally* PI Mot. (ECF No. 2). On the same day, the Court denied that motion as to the request for a temporary restraining order, finding that Plaintiff failed to meet the "high standard" required for issuing a temporary restraining order and that "the material Plaintiff cites suggest there is a plausible, non-retaliatory, and statutorily permitted reason for revoking his permit." Order (ECF No. 3). The Court further indicated that it would consider a preliminary injunction motion on an expedited timeline upon proper service to Defendants. *Id.* On the same day Plaintiff notified NPS via email of the pending motion for preliminary injunction. As of the filing of this opposition, Plaintiff has not served Defendants with the complaint and summonses as required by Rule 4.

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted). Such a request involves the exercise of a very far-reaching power that "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted). The movant must demonstrate all of the following factors by "a clear showing": (1) likelihood of success on the merits; (2) irreparable harm absent preliminary emergency relief; (3) the balance of equities between the parties tips in favor of the movant; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The third and fourth factors, harm to the opposing party and the

public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009) (rejecting view that the public interest is "negligible" when juxtaposed against a single person's claim).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, Civ. A. No. 18-0578 (JEB), 2018 WL 3232515, at *4 (D.D.C. July 2, 2018) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009)). The Supreme Court subsequently reaffirmed its disagreement with the sliding scale approach holding that "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20). And where a party "seeks a mandatory injunction—to change the status quo through action rather than merely to preserve the status quo—typically the moving party must meet a higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006); *Pantoja v. Martinez*, No. 21-7118, 2022 WL 893017, at *1 (D.C. Cir. 2022) (*per curiam*) (characterizing injunction that would reinstate the plaintiff in his prior leadership roles as a "mandatory preliminary injunction ... requir[ing] a higher standard than an ordinary preliminary injunction"); *but see League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (rejecting distinction between a mandatory and prohibitory injunction).

Regardless, if the Court concludes that a claim fails as a matter of law—on a point of jurisdiction or merits—then a preliminary injunction is inappropriate. *See United States Ass'n of*

*Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017). Moreover, if the moving party fails to make a sufficient showing of irreparable injury, the Court may deny the request for preliminary injunctive relief without considering the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Preliminary injunctions are not "awarded as of right," but "[a]s a matter of equitable discretion, a preliminary injunction does not [even] follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018). "Rather, a court must be persuaded as to all four factors." *Scottsdale Capital Advisors Corp. v. Fin. Indus. Regul. Auth. Inc.,* 678 F. Supp. 3d 88, 100 (D.D.C. 2023).

## ARGUMENT

### I.    <u>Plaintiff is Unlikely to Succeed on the Merits.</u>

#### A.    **Plaintiff Lacks Standing.**

"Federal courts start from the presumption that they lack … jurisdiction" to issue emergency relief, and "the party invoking a federal court's jurisdiction has the burden of proving it." *U.S. Conf. of Cath. Bishops v. Dep't of State*, 770 F. Supp. 3d 155, 161 (D.D.C. 2025) (McFadden, J.). Indeed, if the Court "concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *see also Schindler Elevator Corp. v. Wash. Metro Area Transit Auth.*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020) (dismissing case *sua sponte* after finding the plaintiff lacked standing); *Cross v. EEOC*, Civ. A. No. 25-3702 (TNM), 2025 WL 3280764, at *9 (D.D.C. Nov. 25, 2025) (same).

To meet article III standing, a plaintiff must show that "he suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Barry v. United Food & Com. Workers*, 755 F. Supp. 3d 34, 44 (D.D.C. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (internal

quotation marks omitted).  Second, he must show that "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id* (quoting *Lujan*, 504 U.S. at 560) (international quotation marks omitted). Third, it must be likely that the harm "will be redressed by a favorable decision."  *Id.* (quoting *Lujan*, 504 U.S. at 560) (international quotation marks omitted).

Moreover, federal courts have imposed "prudential limitations" on standing, "foremost" of which is "the rule that a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Cheeks v. Fort Myer Constr. Co.*, 722 F. Supp. 2d 93, 108 (D.D.C. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) (internal quotation marks omitted).  This is based on the principles that "courts should not adjudicate the rights of third parties unnecessarily and that third parties will usually be the best proponents of their own rights." *Id.*  To depart from this rule, "there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.* (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)) (internal quotation marks omitted); *Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1362 (D.C. Cir. 2000) (same).

Consistent with this rule, Courts routinely conclude that an individual lacks standing to seek redress for injuries belonging to a separate legal entity.  For example, "[n]o shareholder—not even a sole shareholder—has standing in the usual case to bring suit in his individual capacity on a claim that belongs to the corporation." *Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 n.14 (D.C. Cir. 1984); *see also Bronner v. Duggan*, 364 F. Supp. 3d 9, 19 (D.D.C. 2019) ("The prohibition on seeking relief for a third-party has long limited the ability of shareholders in a corporation to vindicate the corporation's rights, except in specific circumstances.").  To have standing, a shareholder must "identify a legal interest that has been directly or independently

harmed . . . that does not derive from the injury to the corporation." *Cheeks*, 722 F. Supp. 2d at 109 (citation modified).   A shareholder's emotional damages resulting from the corporation's economic harm, for example, are derivative and insufficient for standing. *Harpole Architects, P.C. v. Barlow*, 668 F. Supp. 2d 68, 77 (D.D.C. 2009).   Thus, the CEO of a construction company lacks standing to sue in his own name for contract interference because any damages would accrue to the company. *Cheeks*, 722 F. Supp. 2d at 109-110.   The CEO only has standing to assert his "direct personal injury[.]" *Id.*   Similarly, the president and sole shareholder of a firm lacks standing to bring a discrimination claim under 42 U.S.C. § 1981 against utility companies that refused to contract with the firm. *Searcy v. Houston Lighting & Power Co.*, 907 F.2d 562, 564-65 (5th Cir. 1990), *cert. denied*, 498 U.S. 970 (1990).

This rule prohibits individual plaintiffs, like Plaintiff here, from asserting the rights of a non-profit corporation.  *See, e.g.*, *Franklin v. Vilsack*, Civ. A. No. 12-2027 (RJL), 2012 WL 6625757, at *1 (D.D.C. Dec. 18, 2012) ("Plaintiff has no standing to assert claims on behalf of any organization or any other individual."); *Reedom v. Sec'y of Agric.*, Civ. A. No. 12-1927 (JDB), 2012 WL 6085390, at *1 (D.D.C. Nov. 29, 2012), *aff'd sub nom. Reedom v. Vilsack*, 502 F. App'x 4 (D.C. Cir. 2013).

Plaintiff does not meet the standing requirements.  His allegations and requested relief all derive from actions related to a permit issued to a FLARE, a non-party organization.  *See* Mytych Decl. (ECF No. 2-1) ¶ 6; NPS Permit (ECF No. 2-4) at 8 (showing amended permit issued to FLARE USA); Deas Decl. ¶ 16, Attach. 6; Deas Decl. ¶¶ 6-7, Attach. 1 (FLARE is the permittee; Plaintiff was neither the "Individual/Organization" or "Person in Charge of Event" on the application).   The permit is a legal entitlement held by FLARE, and the procedural protections in 36 C.F.R. § 7.96 that Defendants allegedly violated protect the permittee's interests.  Accordingly,

the "legally protected interest" Plaintiff asserts in the permit is not his but FLARE's. And the alleged revocation of the permit is therefore an injury to FLARE, not Plaintiff. Consequently, a favorable decision restoring FLARE's permit location at Columbus Plaza would not redress a "direct personal injury" to Plaintiff. *See Cheeks*, 722 F. Supp. 2d at 110. Plaintiff cannot proceed with his claims here because he "cannot rest his claim to relief on the legal rights or interests of third parties." *Id*. FLARE enjoys independent "First Amendment protection" and, as the permittee, is the best proponent of its claimed legal entitlement to demonstrate at Columbus Plaza. *See Citizens United v. FEC*, 558 U.S. 310, 342 (2010).

Plaintiff has not alleged "a direct personal interest at stake that is distinct from" FLARE's interests. *See Cheeks*, 722 F. Supp. 2d at 109. Plaintiff alleges in the Complaint that he is a "lead organizer of the FLARE USA demonstration at Columbus Plaza," Compl. (ECF No. 1) ¶ 11. But Plaintiff is not the permittee; indeed, he was not even identified as the "Person in Charge of Event" on the permit application. Permit Application (ECF No. 2-4 at 30, 33). Plaintiff's role in the organization is immaterial as to whether he has standing to assert rights that belong to the organization. *See Searcy*, 907 F.2d at 564-65; *Cheeks*, 722 F. Supp. 2d at 109-110.

The only direct personal injury Plaintiff ostensibly alleges is harm to his "First Amendment rights," Mytych Decl. (ECF No. 2-1) ¶ 25, but his motion fails to spell out in any adequate way how Defendants have infringed his own First Amendment rights. His descriptions of Defendants' alleged First Amendment violations consist entirely of alleged procedural violations of NPS regulations with respect to FLARE's demonstrations. *See* PI Mot. (ECF No. 2) ¶¶ 16-22. At most, Plaintiff describes a First Amendment injury to the organization. He does not allege any individualized facts about his own inability to exercise his First Amendment rights distinct from the alleged injury to the organization.

Because Plaintiff lacks standing, the Court should deny his motion for a preliminary injunction.

### B.     Plaintiff is Unlikely to Succeed on His First Amendment Claim.

In a traditional public forum, the government may impose content-neutral time, place, and manner restrictions that are narrowly tailored to serve significant governmental interests and leave open ample alternative channels of communication. *A.N.S.W.E.R. Coal. v. Jewell*, 153 F. Supp. 3d 395, 406 (D.D.C. 2016). It is "well settled that the government need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1991).

Content-neutral land-use decisions by the government do not threaten First Amendment rights absent evidence that the decisions were motivated by a desire to suppress expression. Content-neutral park-permit ordinances, containing "reasonably specific and objective" grounds for denying applications, do not offend the First Amendment. *Thomas v. Chicago Park District*, 534 U.S. 316, 324 (2002). That is so where the licensor does not "pass judgment on the content of speech," the ordinance is directed to "all activity conducted in a public park," and "[n]one of the grounds for denying a permit have anything to do with what a speaker might say." *Id.* at 322. In these circumstances, a Plaintiff must show that the decision to deny a license is motivated by a desire to suppress expressive activities. *Wemhoff v. Bush*, 167 F. Supp. 2d 32, 34 (D.D.C. 2001). "In the absence of such a showing, Congress's broad power to dispose of federal property may not be disturbed." *Id.* (citing *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976)).

Here, NPS's closure of Columbus Plaza and relocation of FLARE's demonstration are content-neutral. As indicated in the Record of Determination, the temporary closure is "for the renovation of the fountain, cleaning of the statues, plaza and turf renovations to the park site." ROD (ECF No. 2-4 at 18). The closure applied to all public uses of the park, not only to FLARE.

*See id.*  The closure is consistent with NPS's organic statute and regulations, which authorize NPS to restrict park uses for the "maintenance of public health and safety, protection of environmental or scenic values, [and] protection of natural or cultural resources," among other purposes that have nothing to do with the content of expressive activity.  *See* 54 U.S.C. § 100102; 36 C.F.R. § 1.5(a). The closure is also part of a "a coordinated beautification plan for Federal and local facilities, monuments, lands, parks, and roadways in and around the District of Columbia," pursuant to implementation of Executive Order 14252.  Nersesian Decl. ¶¶ 5-7.  This Court recognized as much when it denied Plaintiff's application for a temporary restraining order.  Order (ECF No. 3) ("[T]he material Plaintiff cites suggests there is a plausible, non-retaliatory, and statutorily permitted reason for revoking his permit.").

The relocation of FLARE's demonstration is likewise consistent with NPS regulations and unrelated to the content of Plaintiff's expressive activity.  The regulations allow for denial of a permit application where a demonstration "cannot reasonably be accommodated" in a particular area, or where continuation of a demonstration would threaten "public safety, good order, or health."  36 C.F.R. § 7.96(g)(4)(vii).  The regulations offer no opportunity to terminate or relocate a demonstration based its content.  *See Thomas*, 534 U.S. at 324.  Consistent with those regulations, NPS informed FLARE that due to its impending closure for renovations, Columbus Plaza "is no longer suitable" for the organization's "permitted activity," Richardson Email (ECF No. 2-4) at 5, and advised in its public notice that the closure "is necessary for the work to be completed safely for workers and the public."  ROD (ECF No. 2-4 at 18).  NPS's grounds to relocating FLARE's demonstration had "nothing to do with the content of" Plaintiff's expressive activity.  *See Thomas*, 534 U.S. at 322.

Plaintiff does not come close to alleging any motivation to relocate FLARE's demonstration based on its expressive activity. Plaintiff concedes, as he must, that NPS did not deny FLARE's November 7, 2025, permit application for Columbus Plaza. Mytych Decl. (ECF No. 2-1) ¶ 10. He asserts, however, that a verbal warning preceded the written notification that allegedly was "created afterward to justify it," and he suggests a temporal proximity link to "negative coverage of FLARE by right-wing social media influencers." *Id.* ¶¶ 21, 24; *see also* PI Mot. (ECF No. 2) at ¶ 21 (making assertions "[o]n information and belief"). Generously stated, all that Plaintiff can offer is speculation about NPS's supposed motivations, and that is insufficient.

NPS's closure of Columbus Plaza is also narrowly tailored to serve a significant government interest. The government has a substantial interest in protecting park resources and ensuring public safety. In *Clark v. Community for Creative Non-Violence*, the Supreme Court upheld NPS's camping ban on the National Mall and Lafayette Park where the regulation was "narrowly focuse[d] on the Government's substantial interest in maintaining the parks in the heart of the Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence." 468 U.S. 288, 296 (1984); *see also Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981) ("[I]t is clear that [the government's] interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective"); *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) ("[T]he government has a substantial interest in the preservation and enhancement of the human environment; aesthetics are a proper focus of governmental regulation."). Moreover, while the regulation of the time, place, or manner of protected speech must be narrowly tailored, "it need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989); *see also Clark*, 468 U.S. at 299 (rejecting

view that a regulation was unnecessary because there were "less speech-restrictive" alternatives to the blanket ban on sleeping).

As explained above, NPS's closure of Columbus Plaza and relocation of FLARE's demonstration are "for the renovation of the fountain, cleaning of the statues, plaza and turf renovations to the park site," ROD (ECF No. 2-4 at 18), consistent with NPS's interests in the "maintenance of public health and safety, protection of environmental or scenic values, [and] protection of natural or cultural resources." 36 C.F.R. § 1.5(a); 54 U.S.C. § 100102. The closure is limited in geographic scope and duration; the ROD specifies that the external sidewalk remain open and sets a finite period (December 10, 2025, to June 1, 2026) based on the time needed to complete the project "in a safe and timely manner and enable the park to return the fountain and site for park visitors, future permitted events, and other park uses." ROD (ECF No. 2-4 at 18). Plaintiff does not suggest that NPS's closure and demonstration relocation are substantially broader than necessary.

NPS's temporary closure and relocation of FLARE's demonstration leave open ample alternatives channels for expression. The First Amendment does not guarantee the right to speak exactly where and how a speaker finds most effective. *See Heffron*, 452 U.S. at 647 (no First Amendment right to "communicate one's views at all times and places or in any manner that may be desired"); *A.N.S.W.E.R. Coal. v. Jewell*, 153 F. Supp. 3d at 415 ("[The plaintiff] has cited no case law supporting the proposition that [it] is entitled to protest at the specific location that it believes will be most effective."), *aff'd in part sub nom.*, 845 F.3d 1199 (D.C. Cir. 2017).

FLARE demonstrators may continue to speak, assemble, perform, display art, and conduct education outreach and other expression at Stanton Park, an urban park close to Columbus Circle. ECF No. 2-4 at 5-14. FLARE is free to apply for a permit to demonstrate at other park areas

administered by NPS's National Capital Region where there is a large presence of commuters and Capitol-bound pedestrians. *See* 36 C.F.R. § 7.96(a). FLARE can also apply for a demonstration permit for Columbus Plaza upon the conclusion of NPS's projected summer 2026 project completion. Plaintiff's objections to the proposed alternate site at Stanton Park – that it is more residential than Columbus Plaza and temporary structures are not allowed as part of FLARE's permitted demonstration – do not amount to showing that FLARE's alternative channels of communication are inadequate under the First Amendment. *See A.N.S.W.E.R. Coal.*, 845 F.3d at 1216. Moreover, the amended permit's prohibition of temporary structures is not a deprivation of any rights, as FLARE's permit for Columbus Plaza included the same restriction. Deas Decl. Attach. 4 at 6. At most, these objections show that NPS's proposed alternative site creates an inconvenience for FLARE and does not fully align with Plaintiff's preference for Columbus Plaza.

But neither the First Amendment nor NPS regulations requires NPS to provide an alternate site that matches Plaintiff's preferences or provides all the advantages of the original site. Moreover, NPS must "reasonably take into account possible damage to the park, including trees, shrubbery, other plantings, park installations and statues" in connection with proposing an alternate site. 36 C.F.R. § 7.96(g)(4)(vii)(C). NPS's proposed alternate site, Stanton Park, is an urban park surrounded by streets with a mixture of hardscape, landscaping, and permanent commemorative works and is proximate to Columbus Plaza. *See* Email dated December 9, 2025 (ECF No. 2-4 at 5). In any case, Plaintiff's objections to the alternatives narrowly concern NPS's proposed alternate site and do not show that he has been left without ample alternative channels for communication.

Because NPS's closure of Columbus Plaza and relocation of FLARE's demonstration are content-neutral, are narrowly tailored to serve legitimate government interests, and leave Plaintiff

with ample alternative channels for communication, Plaintiff is unlikely to succeed on his First Amendment claims.

C.     **Plaintiff is Unlikely to Succeed on His APA Claim.**

As a preliminary matter, the NPS regulations Plaintiff cites do not themselves create a private cause of action; any alleged violation is reviewable, if at all, as an APA claim.  *See* 5 U.S.C. § 706(2)(A), (D); *see Mashack v. Jewell*, 149 F. Supp. 3d 11, 36 (D.D.C. 2016) (evaluating claims that NPS violated 36 C.F.R. §§ 1.5 and 1.7 under the APA).

Under the APA, a court may hold unlawful and set aside an agency decision on the basis that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure required by law," or based on other grounds listed in the statute. 5 U.S.C. § 706(2)(A), (C), (D). "[W]hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the [APA's] deferential arbitrary-and-capricious standard." *S. Airways Express, LLC v. United States Dep't of Transp.*, 159 F.4th 50, 58-59 (D.C. Cir. 2025) (citing *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 179-80 (2025)) (citation modified).  In applying this "narrow" standard, the court "asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Id.* (internal quotation marks and citations omitted).  The court must take "due account" of the "rule of prejudicial error" in determining whether the decision should be held unlawful and set aside under the APA.  5 U.S.C. § 706.

NPS acted within its closure authority under 36 C.F.R. § 1.5.  That regulation provides that the superintendent may "close all or a portion of a park area to all public use or to a specific use or activity" based on a determination that the closure is "necessary for the maintenance of public health and safety, protection of environmental or scenic values, protection of natural or cultural resources, [and] implementation of management responsibilities," among other grounds.

- 19 -

36 C.F.R. § 1.5(a).  As an illustration, this Court upheld NPS's temporary closure of Buzzard Point Marina under § 1.5(a) where the record of determination reported the need for "facility stabilization, maintenance, and safety related projects and activities." *Mashack*, 149 F. Supp. 3d at 17.

The NPS's ROD explicitly cites construction-related needs – fountain renovation, statue cleaning, plaza and turf work, and associated construction staging – and resulting dangers to public safety as the bases for temporary closing Columbus Plaza.  These reasons fall squarely within the regulation's health, safety, and resource-protection purposes.

NPS complied with the procedural requirements of 36 C.F.R. § 1.5 and § 1.7.  In the event of a closure under section 1.5, NPS is required to "prepare a written determination justifying the action" before the closure is implemented.  36 C.F.R. § 1.5(c).  The determination must set forth the reasons for the closure and explain why less restrictive measures will not suffice and be available to the public upon request.  *Id.*  Section 1.7(a) requires that closures be publicized through signs, maps, or other appropriate methods.

NPS met these regulatory requirements.  It issued a written record of determination for its closure of Columbus Plaza indicating the reasons for the closure and why less restrictive measures would not suffice.  The closure is necessary for construction-related needs (described above) and to provide for "for public health and safety, protect scenic value and cultural resources, implement management responsibilities, and avoid conflict among visitor use activities during the renovation of the park."  ROD (ECF No. 2-4 at 18).  The "duration is as limited as possible to provide for public safety while construction work is ongoing," and "[m]ore limited closures were considered but would not suffice to provide for public safety" based on input from contractors.  *Id.*  NPS also issued a Notice to the Public on December 9, 2025, ahead of the scheduled 4:00 PM closure on

December 10, 2025.  ECF No. 2-4 at 16.  This Notice was posted on the National Park Website on December 9, 2025.  Public Notice of Closure.

Finally, NPS complied with the procedural requirements of 36 C.F.R. § 7.96.  That section establishes a permit system for special events and demonstrations in National Capital Region parks.  It provides among other things rules for processing applications and grounds for revoking permits, which have already been exhaustively described *supra*.  NPS amended FLARE's demonstration permit both on safety grounds and because the demonstration could no longer be accommodated at Columbus Plaza due to the construction project scheduled to begin on December 10, 2025.  *See* ROD (ECF No. 2-4 at 18).  Instead of an outright revocation, NPS offered an amended permit for an alternative demonstration site at a nearby urban park, consistent with Section 7.96's application denial provisions.  *See* ECF No. 2-4 at 7; § 7.96(4)(vii).

Plaintiff fails to show even a slight deviation from NPS's regulations, much less a "prejudicial error."  He avers that a verbal warning preceded NPS's written notification to FLARE regarding the closure, but points to no regulation prohibiting advance verbal warnings regarding closures.  PI Mot. (ECF No. 2) ¶ 26.  He avers that NPS made a "decision" before issuing the closure notice and Record of Determination, but fails to explain how basing the closure on a decision violates any regulation or "evidences a pretext."  *Id.* ¶¶ 26-27.  He argues that NPS violated 36 C.F.R. § 7.96 by "failing to issue a valid written revocation" or show a "clear and present danger" justifying the revocation.  *Id.* ¶ 28.  But these statements are at odds with his own filings, which show a written amendment by email and an ROD describing the specific safety-related reasons for the closure.  *See* Email dated December 9, 2025 (ECF No. 2-4 at 5); Public Gathering Permit (ECF No. 2-4 at 7).  Finally, Plaintiff argues that NPS violated § 7.96(g)(3) by "refusing to honor Plaintiff's deemed-granted permit."  PI Mot. (ECF No. 2 ¶ 28).  Plaintiff refers

to a provision of the NPS regulations under which permit applications are deemed granted if not denied within 24 hours to protect applicants from indefinite inaction on permit applications. 36 C.F.R. 7.96(g)(3). But Plaintiff's application was not "deemed-granted"; the FLARE Permit for Columbus Plaza was issued by NPS within 24 hours of FLARE's application submission. *See* Deas Decl. ¶¶ 7-9. Even if minor clerical errors that were immediately corrected (*see id.* ¶¶ 11-14) had somehow rendered the permit invalid and FLARE's application deemed-granted, as Plaintiff argued in his email exchanges with DPM (Deas Decl., Attach. 3 at 2), this fact would not alter or further limit the NPS's closure authority under § 1.5 or convert FLARE's permit into a permanent entitlement as Plaintiff suggests.

Because Plaintiff has not shown that NPS violated any applicable regulation or statute, he cannot establish an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law," or that meets other grounds for holding unlawful and setting aside the action under the APA. *See* 5 U.S.C. § 706(2). Plaintiff is therefore unlikely to succeed on his APA claim.

## II.    Plaintiff Has Failed to Establish Irreparable Harm.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy*, 454 F.3d at 297. The moving party must demonstrate an injury that is "'both certain and great'" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Santos v. Collins*, Civ. A. No. 24-1759 (JDB), 2025 WL 1823471, at *6 (D.D.C. Feb. 26, 2025) (quoting *Chaplaincy*, 454 F.3d at 298). The injury must "be beyond remediation," and thus where, as here, the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [such possibility] weighs heavily against a claim of irreparable harm." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025) (citation modified). Plaintiff has the burden to put forth sufficient evidence to satisfy this high

standard. "The movant cannot simply make 'broad conclusory statements' about the existence of harm. Rather, [the movant] must 'submit[ ] . . . competent evidence into the record . . . that would permit the Court to assess whether [the movant], in fact, faces irreparable harm[.]'" *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)). Plaintiffs must "substantiate" their claim of irreparable harm with "proof." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiff does not meet this exacting standard.

Plaintiff's supposed harms are speculative, logistical inconveniences that are significantly less injurious than even economic damages that are commonly not found to constitute irreparable harm. *See id.* He asserts that leaving Columbus Plaza will "break the continuity" of FLARE's 24/7 vigil, involve inconveniences associated with relocating and demonstrating without structures, reduce communication with members of Congress and staff, "chill participation by volunteers and supporters," and deprive FLARE of the opportunity to demonstrate in Columbus Plaza's "unique forum." PI Mot. (ECF No. 2) ¶¶ 34-37. The least speculative of Plaintiff's supposed harms – the disruption to the vigil and relocation difficulties – are not severe hardships that warrant extraordinary relief. Plaintiff has not shown that these inconveniences amount to a concrete injury so severe that it is likely to dissolve the operation. *See Wis. Gas Co.*, 758 F.2d at 674. The rest of his assertions describe injuries that are too speculative and theoretical to warrant injunctive relief. He offers no evidence that the temporary closure of one area will prevent meaningful access to members of Congress or cause so much fear of future closures that it will "chill participation" of FLARE supporters. *See id.* ("injury must be actual and not theoretical"); *Henke v. Dep't of the Interior*, 842 F. Supp. 2d 54, 56 (D.D.C. 2012) ("Courts will not grant injunctive relief "against something merely feared as liable to occur at some indefinite time.").

Plaintiff's supposed First Amendment injury is likewise speculative and falls short of irreparable harm.  "Even in the sensitive areas of freedom of speech and religion, where the risk of chilling protected conduct is especially high, we do not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its rights."  *Hanson v. Dist. of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024).  A "bare assertion of a First Amendment violation, without more, is insufficient to make out irreparable harm."  *Baker DC v. Nat'l Lab. Rels. Bd.*, 102 F. Supp. 3d 194, 199 (D.D.C. 2015) (citation modified). Determining whether alleged First Amendment violations constitute irreparable harm "requires some consideration of whether [the plaintiff] has demonstrated a likelihood of success on the merits of its First Amendment claim." *Id.*; *see also Am. Meat Inst. v. Dep't of Agric.*, 968 F. Supp. 2d 38, 76 (D.D.C. 2013) (finding no irreparable harm from alleged First Amendment violation because "the Court has already determined that Plaintiffs do not have a likelihood of success on the merits of their First Amendment claim").

Plaintiff's assertions here of a First Amendment violation are bare.  He emphasizes FLARE's mission – "to influence national debate and congressional action" – and claims that the "current moment, in which impeachment and democratic backsliding are being actively contested, cannot be recreated later."  PI Mot. (ECF No. 2) ¶ 33.  He also speculates that once the vigil is broken up and the "unique forum is lost, the opportunity to speak in that place, at that time, to that audience is gone forever."  *Id.* ¶ 37.  But he does not explain why or offer any evidence that the closure prevents him from influencing national debate and congressional action in the current moment.  Nor does he explain how the narrow limit of demonstrating "in that place, at that time, to that audience" deprives him of his First Amendment rights.  *See Heffron*, 452 U.S. at 647 (no

First Amendment right to "communicate one's views at all times and places or in any manner that may be desired"); *A.N.S.W.E.R. Coal.*, 153 F. Supp. 3d at 415.

Moreover, as discussed above, Plaintiff's First Amendment claims are unlikely to succeed on the merits. The closure is content-neutral, narrowly tailored to statutorily prescribed construction and safety interests, and leaves ample alternate channels, including other forums in the Capitol area. And the First Amendment does not guarantee access to Plaintiff's preferred location. *A.N.S.W.E.R. Coal.*, 153 F. Supp. 3d at 415 (plaintiff offered no support for assertion that he was "entitled to protest at the specific location that it believes will be most effective").

Plaintiff therefore has failed to show that he would be irreparably harmed absent the requested preliminary injunction.

## III. The Balance of Equities Favors Defendant, and the Public Interest Does Not Support the Injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These factors tilt decisively against granting a preliminary injunction here. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), appeal dismissed, No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025).

Plaintiff's interest in maintaining a demonstration at Columbus Plaza is outweighed by the government's (and public's) interests related its construction project. The government has an interest not only in safe, orderly, and efficient management of an active construction zone in a national park area adjacent to a major transportation hub, but also an interest in the purposes of the construction project itself. *See* ROD (ECF No. 2-4 at 18) (documenting safety reasons for closure).

As discussed above, the construction is for the purpose of fountain renovation, statue cleaning, plaza and turf work, and associated construction staging, at Columbus Plaza.  *Id.*; Nersesian Decl. ¶¶ 9-14.  These further the NPS's mission, pursuant to its organic statute, "to conserve the scenery, natural and historic objects" within the National Park System.  54 U.S.C. § 100101; *see also* Nersesian Decl. ¶¶ 5-7; *Clark*, 468 U.S. at 296; *Heffron*, 452 U.S. at 650; *White House Vigil for ERA Comm.*, 746 F.2d at 1528.

Granting Plaintiff the injunction he seeks would directly impair these interests.  An injunction enjoining the closure would halt and delay the planned renovations and improvements to Columbus Plaza.  NPS would have to adjust and shoulder the costs and logistical consequences associated with a sudden closure and extended delay, which are ultimately borne by the public.  On a broader scale, such an injunction would threaten timely and efficient upkeep of NPS lands requiring closures to carry out necessary work.  Such harms are concrete, foreseeable, and substantial.

Plaintiff, by contrast, does not assert his own First Amendment rights.  Rather, he asserts the alleged interest of a non-profit organization to access a place of its own choosing.  Those alleged interests are modest and mitigated by the availability of alternative fora.  Whereas the government's construction project is meeting needs specific to Columbus Plaza, FLARE's ability to carry out demonstrations to "influence national debate and congressional action" does not depend specifically on access to Columbus Plaza.  Plaintiff attempts to portray Columbus Plaza as a "unique" forum, but does not show how losing temporary access to the Plaza would undermine his interest in expressive activity.  FLARE's primary burdens, as discussed above, involve relatively modest logistical inconveniences associated with relocation to an alternate site.

In short, the balance of equities weigh decisively for NPS.

**IV.**   <u>**Any Preliminary Injunction Should Be Stayed.**</u>

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or, at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

**V.**   <u>**The Court Should Order that Plaintiffs Post a Bond as a Condition of Preliminary Relief.**</u>

Defendants also respectfully requests that any injunctive relief be accompanied by a bond. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  A bond is appropriate here given that the requested preliminary relief would potentially require the Executive to spend money and resources that may not be recouped once distributed and employed.

\*     \*     \*

## CONCLUSION

For these reasons, Plaintiff's motion for a preliminary injunction should be denied.

Dated: December 17, 2025

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

PETER C. PFAFFENROTH, D.C. Bar 496637
Chief, Civil Division

By: _____/s/ Dimitar P. Georgiev_____
    DIMITAR GEORGIEV, D.C. Bar #1735756
    DAVID S. BETTWY, D.C. Bar No. #155148
    Assistant United States Attorneys
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2500 (Main)

*Attorneys for the United States of America*