UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAVID MYTYCH**,<br><br>    Plaintiff,<br><br>    v.<br><br>**NATIONAL PARK SERVICE**, *et al.*,<br><br>    Defendants. | Case No. 1:25-cv-4291 (TNM) |

## **MEMORANDUM ORDER**

  David Mytych helps run a volunteer nonprofit called FLARE USA.  For months, FLARE maintained a demonstration outside Union Station in Washington, D.C., to express its views on various political issues.  FLARE had a National Park Service ("NPS") permit to do so.  But toward the year's end, NPS told Mytych and FLARE that a construction project required the demonstration to move to a nearby park.  That order prompted this lawsuit.

  Mytych, proceeding pro se, brings claims under the Administrative Procedure Act along with an ultra vires challenge, arguing that NPS violated the First Amendment and its own regulations in its treatment of his and FLARE's activity.  He seeks a declaration that NPS acted unlawfully and a preliminary injunction barring NPS from evicting him and FLARE from the original demonstration spot.

  But a few hurdles prove insurmountable for Mytych.  For his claims that NPS violated its regulations, Mytych has failed to establish standing.  Mytych tethers those claims to NPS's revocation of a permit, but that permit belonged to FLARE, not him.  Mytych must base his claims on his own legal interests, not those of third parties.  For his First Amendment challenge, Mytych faces a different problem.  Though Mytych plausibly alleges standing, he has not shown

a likelihood of success on the merits of that claim. NPS adhered to reasonable time, place, and manner restrictions in relocating the demonstration and temporarily closing the demonstration spot for construction. The Court thus dismisses some claims for lack of standing and denies the preliminary injunction motion.

I.

In 1916, Congress established NPS as an agency within the Department of Interior. National Park Service Organic Act, Ch. 408, § 1, 39 Stat. 535 (1916). NPS's "purpose is to conserve" and "provide for the enjoyment of the scenery, natural and historic objects, and wild life" on NPS land in ways that leave the land "unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

To meet those goals, NPS must sometimes close or limit park areas. Its regulations specify when and how it may do so. Mytych has no quibble with these regulations. Closures are permissible, for instance, when "necessary for the maintenance of public health and safety, protection of environmental or scenic values, protection of natural or cultural resources, aid to scientific research, implementation of management responsibilities, equitable allocation and use of facilities, or the avoidance of conflict among visitor use activities." 36 C.F.R. § 1.5(a). Before closing a park, NPS must provide a written justification for its decision, except in emergencies. *Id.* § 1.5(c). NPS must also notify the public about closures through signs, maps, publications, or other appropriate methods. *Id.* § 1.7(a).

Another way NPS regulates park use is through permits. In the D.C. area, one may hold a demonstration or special event in an NPS-run park only with a valid permit. *Id.* § 7.96(g). Once an individual or group submits a permit application, the regulations consider that permit granted absent a denial within 24 hours of receipt. *Id.* § 7.96(g)(3).

Once granted, though, NPS may revoke a permit on several grounds. *Id*. § 7.96(g)(4)–(6). NPS may revoke a demonstration permit, for instance, when that demonstration "cannot reasonably be accommodated in the particular area," or if "continuation of the event presents a clear and present danger to the public safety, good order or health." *Id*. § 7.96(g)(4)(vii), (g)(6). In the former situation, the Regional Director must propose an alternative site to the applicant. *Id*. § 7.96(g)(4)(vii)(C).

Consider this case against that backdrop. Mytych helps organize and lead FLARE, a volunteer nonprofit organization committed to political expression and advocacy about authoritarianism, impeachment, and constitutional accountability. Compl. ¶¶ 11–12, ECF No. 1. Since May 2025, FLARE has held a continuous demonstration in Columbus Plaza, a spot in front of Union Station. *Id.* ¶ 20. FLARE picked Columbus Plaza for its position as the "main pedestrian gateway between Union Station and the United States Capitol," *id.* ¶ 21, and it obtained an NPS permit to demonstrate there, *id.* ¶ 23.

The first sign of conflict came in October 2025, when NPS officials ordered Mytych and his fellow demonstrators to leave the protest site and to remove equipment and structures FLARE had set up. *Id.* ¶ 26; Mytych Decl. ¶ 7, ECF No. 2-1. As Mytych alleges, NPS provided FLARE a document about the permit revocation, but never signed it. Compl. ¶ 28. At some point following that notice, officials removed FLARE's structures and demonstration materials. *Id.* ¶¶ 29–31.

The next month, FLARE submitted a new permit application for the same demonstration. *Id.* ¶ 36; November Permit Application ("Nov. Perm. App.") at 30, ECF No. 2-4. Because NPS did not deny the application within 24-hours, it was "deemed granted." 36 C.F.R. § 7.96(g)(3);

3

Compl. ¶ 37–39.  Shortly after the 24-hour window passed, NPS issued a permit excluding the use of structures.  Compl. ¶ 40.

FLARE and Mytych's activity continued until December 8, 2025, when an NPS official "verbally informed" Mytych that he and FLARE would have to vacate Columbus Plaza within two days "because 'construction' was going to start" in the Plaza.  *Id.* ¶ 44.  The same official emailed Mytych confirming that order the next day.  *Id.* ¶ 49; Email at 5, ECF No. 2-4.  The email explained that NPS would close the park "to provide for public safety during a construction project set to begin [that] week."  Compl. ¶ 49; Email at 5.  It also "propose[d] Stanton Park as an alternative site for [the] demonstration," and attached a draft permit to the email "updating the location."  Compl. ¶ 49; Email at 5.  Though Stanton Park sits just a few blocks away from Union Station, Mytych did not "agree[] to or sign the Stanton Park amendment."  Compl. ¶¶ 53, 56.

NPS's December actions led Mytych to this Court.  He filed a Complaint against NPS, Deputy Director of Operations Frank Lands, Regional Director Jennifer Nersesian, Superintendent Kevin Griess, and Deputy Superintendent Chad Tinney (collectively, "NPS").  *Id.* at 1.  He brings two claims under the Administrative Procedure Act.  5 U.S.C. § 706(2).  First, he alleges that his eviction from Columbus Plaza violated the First Amendment.  Compl. ¶¶ 68–69.  Second, he claims that NPS violated its own regulations in its treatment of FLARE's permits.  *Id.* ¶ 75.  Mytych also adds an ultra vires claim again asserting that NPS infringed its own regulations.  *Id.* ¶¶ 81–82.  Mytych moved for a temporary restraining order and preliminary injunction.  Pl.'s Mot., ECF No. 2.  He seeks a declaration finding NPS's actions unlawful and an injunction prohibiting NPS from evicting him and FLARE from Columbus Plaza or seizing its equipment.  *Id.* at 8.  The Court denied Mytych's motion for a temporary restraining order.

Order, ECF No. 3. NPS then opposed Mytych's motion for a preliminary injunction, Defs.' Opp'n, ECF No. 6, and Mytych never submitted a reply. The motion is ripe, and the Court turns to it now.

## II.

A preliminary injunction is "an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (cleaned up). The movant must surmount a high bar and establish four factors by "a clear showing": first, that he is likely to succeed on the merits; second, that he will likely suffer irreparable harm in the absence of injunctive relief; third, that the balance of equities favors granting the relief; and fourth, that the public interest favors the injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). Where, as here, the government is the party opposing injunctive relief, the latter two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Before turning to the merits of a preliminary injunction, the Court must address what amounts to a "threshold question in every federal case"—whether the plaintiff has standing to sue. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To establish this "irreducible constitutional minimum," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up), a plaintiff must establish that he "has suffered or likely will suffer an injury in fact"; "that the injury likely was caused or will be caused by the defendant"; and "that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). These requirements help "ensure that in each case, the proper plaintiff is suing the proper defendant over a kind of injury the Court is able to resolve." *Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10, 22 (D.D.C. 2023).

Courts also impose prudential limitations on standing. Chief among them is the rule that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. This principle follows from the notion that courts should not unnecessarily adjudicate the rights of third parties, and that third parties will usually be the best proponents of their own rights. *See Singleton v. Wulff*, 428 U.S. 106, 113 (1976). To depart from this rule, "there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *see Trump v. CASA, Inc.*, 606 U.S. 831, 867 (2025) (Alito, J., concurring) ("So long as third-party standing doctrine remains good law, federal courts should take care to apply [its] limitations conscientiously. . . .").

Plaintiffs must support each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the preliminary injunction stage, that means a plaintiff must make a "clear showing" that he is "likely" to establish standing. *See Winter*, 555 U.S. at 22 (emphasis omitted); *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). These requirements apply to "each claim [a plaintiff] seeks to press and for each form of relief that is sought" because "standing is not dispensed in gross." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (cleaned up). Should a plaintiff fail to establish standing for any claims, the Court may dismiss them sua sponte. *See Weaver's Cove Energy, LLC v. R.I. Dep't of Env't Mgmt.*, 524 F.3d 1330, 1332, 1334 (D.C. Cir. 2008).

In conducting this review, the Court construes Mytych's pleadings liberally, keeping in mind that complaints filed by pro se litigants are held to a less stringent standard than formal pleadings drafted by lawyers. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

### III.

Mytych has established standing for only one of his claims. While he has adequately shown standing to raise a First Amendment challenge, he has not for his claims about NPS's regulatory violations.

Start with Mytych's First Amendment claim. Mytych alleges that his "demonstration is core political speech . . . entitled to the highest First Amendment protection." Compl. ¶ 67. He continues that NPS—by "ordering [him] to vacate" the protest site in December—deprived him of his right to demonstrate. *Id.* ¶ 68. And he asks this Court to enjoin NPS from preventing his activity at Columbus Plaza. *Id.* at 13. Those pleadings establish standing. Mytych correctly identifies his First Amendment right to demonstrate. *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.") (cleaned up). The alleged invasion of that right establishes injury. *See Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes . . . injury.").

On causation, NPS's order requiring Mytych to end his Columbus Plaza activity is "proof that the defendant's conduct did in fact cause the plaintiff's injury." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346 (2013). And should the Court enjoin NPS's eviction order as Mytych requests, his Columbus Plaza activity could resume, and his injury would thus be redressed. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 150 (2010). These pleadings satisfy Article III standing.

His First Amendment challenge poses no issues for prudential standing purposes either. Mytych tethers his challenge to "his own" right to First Amendment protection, not that of a

third party. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004); *see* Compl. ¶ 67 ("*Plaintiff's* demonstration is core political speech . . . .") (emphasis added); *id* ¶ 68 (asserting that NPS's conduct "imposed" a "burden on *Plaintiff's* speech") (emphasis added); *id* ¶ 69 (referring to NPS's decision to "remove *Plaintiff*" from the protest site) (emphasis added). All told, Mytych's First Amendment claim gets in the door, especially given the Court's obligation to construe pro se pleadings like Mytych's liberally. *See Erickson*, 551 U.S. at 94.

The same is not true for Mytych's claim that NPS contravened its own regulations. That is because this time, Mytych rests his claims on FLARE's "legal rights or interests," not his own. *See Warth*, 422 U.S. at 499; *Kowalski*, 543 U.S. at 129. How does Mytych claim NPS violated its regulations? By improperly revoking a permit. The trouble for Mytych is that the only permits in his filings belong to FLARE, not to him. In his Complaint, Mytych specifies that "FLARE USA" held "a valid 'deemed-granted' First Amendment demonstration permit for Columbus Plaza." Compl. ¶ 2. He mentions that months ago, NPS reissued "a permit for FLARE at Columbus Plaza." *Id.* ¶ 23. Mytych's exhibits confirm that FLARE, not Mytych, held a demonstration permit. On a permit application from November 7, "FLARE USA" appears under "Individual/Organization" to whom the permit is issued. Nov. Perm. App. at 30. In a notice that Mytych sent to NPS about this permit, he notes how "FLARE USA submitted a First Amendment demonstration permit application." Declaratory Notice ("Notice") at 23, ECF No. 2-4. He emphasizes that for a long time, "FLARE has been operating as the holder of a valid demonstration permit." *Id.* at 27. And when NPS emailed Mytych to relocate the demonstration to Stanton Park, it issued a new permit under "FLARE USA." December Permit ("Dec. Perm.") at 7, ECF No. 2-4.

Mytych has not alleged other facts suggesting that he held his own permit. *See Warth*,

422 U.S. at 504 (noting that parties who impermissibly rested a land ordinance challenge on third-party rights had never themselves "been denied a variance or permit" by city officials). And nothing in his pleadings indicates that FLARE faces "some hindrance" to its own "ability to protect" its "interests" that might permit Mytych to do so instead.  *See Powers*, 499 U.S. at 411. Indeed, FLARE is an organized group that has successfully run multiple lengthy, public protests. Third-party standing doctrine, in contrast, contemplates third parties who face weighty barriers to vindicating their own rights.  *See id.* at 414–15; *Barrows v. Jackson*, 346 U.S. 249, 254, 257 (1953) (concluding that a white landowner has standing to assert rights of black individuals to challenge racially restrictive covenant that only applied to landowners and thus rendered it "difficult if not impossible for the persons whose rights are asserted to present their grievance before any court").

Unlike those groups and individuals, FLARE can protect its own interests, so Mytych, even as a "lead organizer" of FLARE, Compl. ¶ 11, is the wrong plaintiff to sue over its permit. And if he tries to conduct FLARE's case, he may not, as a non-attorney, "appear [pro se] and seek to represent others."  *United States ex rel. Feliciano v. Ardoin*, 127 F.4th 382, 383 (D.C. Cir.) (cleaned up).  The Court thus dismisses his claims challenging the revocation of FLARE's permit.

### IV.

All of this means that on the substance of the preliminary injunction, the Court considers only Mytych's claim that NPS's December eviction violated the First Amendment.  It evaluates each factor in turn, starting with Mytych's likelihood of success on the merits of this claim.[1]

---

[1] If Mytych tethers his motion to the alleged October "raid," Compl. ¶ 25, the Court need not address whether that event violated the First Amendment.  The only relief Mytych appears to seek concerning the October conflict is a declaration that it violated the law.  Pl.'s Mot. at 8.

**A.**

The First Amendment ensures "that members of the public retain strong free speech rights when they venture into public streets and parks." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). These areas are traditional public fora, meaning they "occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (cleaned up). So "the guiding First Amendment principle that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content applies with full force . . . ." *Id.* at 477 (cleaned up). Indeed, viewpoint discrimination is an "egregious form" of content discrimination. *Penkoski v. Bowser*, 548 F. Supp. 3d 12, 20 (D.D.C. 2021) (cleaned up).

That said, these protections "do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." *Cox v. Louisiana*, 379 U.S. 536, 554 (1965). To the contrary, the government *can* regulate speech in traditional public fora with reasonable time, place, and manner restrictions. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Such restrictions are valid "provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.*

---

And "prior to final judgment there is no established declaratory remedy comparable to a preliminary injunction." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). Even if Mytych sought injunctive relief to prevent the recurrence of an NPS "raid," Compl. ¶ 25, the claim would fail for lack of standing because Mytych has not alleged facts showing he will likely suffer from the same harm again. *See Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1280 (D.C. Cir. 2012) ("Even if a plaintiff has suffered past harm from the kind of conduct the suit seeks to enjoin, the plaintiff must establish a real and immediate threat that the harm-producing conduct will recur.") (cleaned up); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

Courts endorse time, place, and manner restrictions to address a variety of significant governmental interests. Take the government's interest in crowd control. Because "two parades cannot march on the same street simultaneously, [the] government may allow only one." *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972) (cleaned up). The government also has an interest in traffic safety. This means demonstrators cannot, "contrary to traffic regulations, insist upon a street meeting" on a busy road at "rush hour as a form of freedom of speech or assembly." *Louisiana*, 379 U.S. at 554. And the government has an interest in land preservation. That is why "[p]rotecting and properly managing park lands are *undoubtedly* significant governmental interests" that, for instance, allow permit requirements for filmmakers using those lands. *Price v. Garland*, 45 F.4th 1059, 1073 (D.C. Cir. 2022) (emphasis added). All these examples involve "reasonable" regulations to meet "legitimate" aims, unrelated to the relevant activity's "message." *Grayned*, 408 U.S. at 115, 117.

The same is true here. NPS reasonably limited Columbus Plaza activity for legitimate reasons, unrelated to Mytych's speech, or anyone else's. Its public closure notice from early December shows as much. There, NPS warned of "a temporary closure of Columbus Circle" for "the renovation of the fountain, cleaning of the statues, plaza and turf renovations to the park site." Record of Determination ("Rec. of Determ.") at 18, ECF No. 2-4. The notice described the closure as "necessary to provide for public health and safety, protect scenic values and cultural resources, implement management responsibilities, and avoid conflict among visitor use activities during the renovation of the park." *Id.* Nowhere in that explanation did NPS mention details about expressive activity, much less about Mytych's specifically. It referred to "demonstration activity" only to assure that "comparable" spaces would serve those needs during construction. *Id.* Between its park management concerns and health and safety concerns, then,

no question remains that NPS has a "legitimate" government interest in Columbus Park upkeep. *Grayned*, 408 U.S. at 117.

And NPS addressed those interests through reasonable, "narrowly tailored" means. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 n.3 (2002) (cleaned up). Its notice indicates that NPS restricted use of Columbus Plaza no more than necessary. NPS expressly "considered" more "limited closures," yet determined that none would "suffice" to protect "public safety" based on contractors' advice. Rec. of Determ. at 18. NPS instead offered "ample alternative channels for communication." *Clark*, 468 U.S. at 293. Its notice stated that "nearby park areas [would] remain open to the public." Rec. of Determ. at 18. Mytych's allegations confirm that NPS meant what it said. Mytych acknowledges that an NPS official "verbally informed" him that "construction" required him to "vacate" Columbus Plaza. Compl. ¶ 44. And shortly after issuing notices, NPS gave FLARE a permit to demonstrate in a different park. Dec. Perm. at 7. The notice also promised that, upon "completion of the project," the park would return to use for "future permitted events." Rec. of Determ. at 18.

Though Mytych hints that NPS had ulterior motives, *see* Compl. ¶ 44 (describing NPS's "alleged[]" construction plans), he supplies no facts to support this theory. Indeed, NPS appears to have started construction, and Mytych does not argue otherwise. *See* Nersesian Decl. ¶¶ 19, 22, ECF No. 6-1. Nothing else in the pleadings suggests NPS's rules have been "administered otherwise than in [a] fair and non-discriminatory manner." *See Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). This means the NPS acted without offending the First Amendment. Mytych is thus not likely to succeed on the merits of his claim.

## B.

Failure to show a likelihood of success of the merits—the "most important factor"—is

enough to deny Mytych's request for a preliminary injunction. *See Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Greater New Orleans Fair Hous. Action Ctr. v. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011) ("When a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors."). Even so, the Court briefly addresses the remaining factors. None alters the balance.

Consider irreparable harm. There is no doubt that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. But "[e]ven in the sensitive area[] of freedom of speech . . . , where the risk of chilling protected conduct is especially high, we do not axiomatically find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its rights." *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024) (cleaned up).

When, as here, a plaintiff "rests entirely on [his] First Amendment claim" to show irreparable harm, the failure to show a likely First Amendment violation on the merits results in a failure to show irreparable harm. *See Edwards v. District of Columbia*, 765 F. Supp. 2d 3, 19 (D.D.C. 2011); *Del. & Hudson Ry. Co. v. United Transp. Union*, 450 F.2d 603, 619–20 (D.C. Cir. 1971) ("[I]n cases involving a claim by movant of interference with protected freedoms or other constitutional rights, the finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant, but depends on an appraisal of the validity, or at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment."); *W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (Wilkinson, J.) ("[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim.") (cleaned up). The Court has already concluded that

Mytych has not shown a likelihood of success on his claim that NPS violated his First Amendment rights. It therefore also concludes that NPS does not pose a risk of irreparable harm to Mytych's First Amendment rights.

The final two factors—public interest and balance of equities—merge when, as here, the government is the opposing party. *See Nken*, 556 U.S. at 434. And if anything, they weigh against Mytych. NPS has an interest in safe, orderly, and efficient management of its construction zones. *See supra* at 10–11. Enjoining NPS's closure could halt or delay its efforts, and "courts . . . should pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Mytych responds that "imminent loss of constitutional rights," a potential "chilling impact," and the need for "robust political expression" tip these factors his way. Pl.'s Mot. ¶¶ 38, 41. The Court disagrees. Having found Mytych has not shown a First Amendment violation, his argument carries little weight.

## V.

To sum up, Mytych has not shown that he has standing to bring claims about NPS's revocation of FLARE's permit. And while Mytych has standing to challenge an alleged violation of his own First Amendment rights, he is not likely to succeed on the merits of that claim. Nor has he established any of the other preliminary injunction factors.

The Motion for a Preliminary Injunction is accordingly DENIED. It is further **ORDERED**

that Counts II and III of Mytych's Complaint are DISMISSED for lack of subject matter jurisdiction. It is further **ORDERED**

that Defendants' response to the remaining Count in the [1] Complaint is now due by

14

February 26, 2026.

**SO ORDERED.**

Dated: February 5, 2026                                           TREVOR N. McFADDEN, U.S.D.J.